JoNes, Chief Judge,
delivered the opinion of the court:
The plaintiff, originally a partnership but subsequently incorporated, sues to recover $154,728.40 which it claims is the balance due it under a contract in which it agreed to manufacture 40,000 overcoats for the Army. The original contract was awarded to plaintiff in 1946 and was one of 18 awarded by the Army to various manufacturers.
The facts, which are set out more fully in the court’s findings of fact, are as follows: On June 14,1946, the Quartermaster Purchasing Office at New York issued invitations for bids for the manufacture of Army field overcoats with removable liners. The invitations stated that the informal bids received would be used as a basis for negotiating contracts.
On June 19, 1946, the plaintiff submitted a bid for the manufacture of 40,000 overcoats at a unit price of $22.75. *720 The bid was accepted and on June 29, 1946, a written contract was entered into between plaintiff and the defendant for the manufacture by plaintiff of 40,000 overcoats at the unit price stated in the bid. On November 27, 1946, the parties executed Modification “C” to the contract which reduced the unit price from $22.75 to $21.
Article 16 of the contract provided that, except as otherwise specifically provided in the contract, all disputes concerning questions of fact which were not disposed of by mutual agreement of the parties would be decided by the contracting officer. This article further provided that the contractor could appeal decisions by the contracting officer to the Secretary of War, and that the Secretary’s decision would be final and conclusive upon the parties.
The contract also stated that certain supplementary contract provisions entitled “Kevision of Price” were incorporated and made a part of the contract, except that the percentage mentioned in the “Kevision of Price” article was changed from 40 percent to 80 percent. The “Kevision of Price” article, which is set out in the court’s finding 6, provided, inter aim, that after 40 percent of the items had been delivered the parties would negotiate to revise the price of all the items covered by the contract; that the contractor would submit a new estimate and breakdown of the unit cost and other relevant data; that the parties would negotiate promptly in good faith as to a revised price, and that if the parties failed to agree the dispute would be disposed of in accordance with the article of the contract entitled “Disputes.” (Article 16.)
On March 17, 1947, plaintiff entered into a subcontract with the W. & C. Clothing Company which agreed to manufacture 7,500 of the overcoats required in plaintiff’s contract at a unit price of $16.06. The W. & C. Clothing Company was one of the 18 contractors engaged in the production of the same type of overcoat for the Army and its contract was identical in form with that of the plaintiff.
In consideration of the Government’s permitting it to subcontract the manufacture of the 7,500 overcoats, plaintiff agreed that any revision of the subcontract unit price of $16.06 would be based “solely upon costs and profits of the *721 subcontractor.” The subcontractor delivered the 7,500 overcoats during 1947 and was paid by plaintiff at a unit price of $16.06, or a total of $120,450. Plaintiff invoiced these overcoats to the Government at a unit price of $21 and received therefor payments aggregating $157,500. The contracting officer subsequently determined that the revised unit price for the W. & C. Clothing Company should be $15.65 for its entire production of overcoats, including the 7,500 manufactured for the plaintiff, and no appeal was taken from that decision.
The evidence does not reveal what negotiations were carried on by the parties, but on October 16,1947, the contracting officer wrote plaintiff, stating that in view of the fact that the parties had failed to agree to a revised price, he had determined that $15 was a fair and reasonable unit price for the 40,000 overcoats. The contracting officer stated that he was taking this action in accordance with the “Revision of Price” article and the “Disputes” article of the contract.
On November 3, 1947, plaintiff filed an appeal from the contracting officer’s decision with the Secretary of War.
On November 24, 1947, the contracting officer notified plaintiff that the contract had been terminated with respect to 3,300 overcoats which had not been delivered to the Army. At that time plaintiff had manufactured and delivered 29,200 overcoats, and the subcontractor had delivered 7,500 overcoats.
On November 13, 1947, the contracting officer issued an amended determination in which he raised the unit price of the 40,000 overcoats from $15 to $15.65.
Plaintiff’s appeal was heard by the Army Board of Contract Appeals on April 21, 1948. On June 14, 1948, the Board issued a decision, modifying the contracting officer’s revised price and fixing the sum of $15,842 as the unit price for the 29,200 overcoats manufactured by the plaintiff under the contract. A rehearing was subsequently held on September 16,1948, after which the Board reaffirmed its former decision in a supplemental opinion. Both decisions of the Board were adopted by the Secretary of the Army.
*722 At the hearing before the Board, the plaintiff submitted a statement of its operating costs for the calendar year 1947 as the cost of its performance of the overcoat contract. The Government offered in evidence an audit of plaintiff’s records for the entire period of performance from December 1, 1946, to December 31, 1947. This audit had been conducted by a representative of the Army Audit Agency. In conducting his audit the Army auditor took into account the fact that the plaintiff had carried on some civilian business while performing under the overcoat contract and allocated a portion of plaintiff’s costs and expenses to the civilian work done by plaintiff. After making several adjustments and disallowances for items he considered not properly chargeable to the Government contract, the auditor reported that plaintiff’s unit cost for manufacturing the 29,200 overcoats was $14.87544. This unit figure did not include officers’ salaries or profit.
The Board, after considering the evidence before it, determined that the unit cost to plaintiff of producing the 29,200 overcoats was $13,659, not including officers’ salaries or profit. In arriving at this figure the Board did not adopt the accounting method used by the Army auditor, nor did it accept the costs as determined in that audit. The Board also determined that 5 percent of the unit cost of production would be a proper compensation for officers’ salaries. This resulted in an allowance of $.683 per garment for officers’ salaries. The Board then considered the question of plaintiff’s profit and determined that an allowance of $1.50 per garment as profit would be reasonable under the circumstances. This figure amounted to approximately 10*4 percent of plaintiff’s unit cost of production and allowance per garment for officers’ salaries. By adding the unit profit of $1.50 to $13,659, the unit cost of production, and to $.683, the unit allowance for officers’ salaries, the Board arrived at its final unit price of $15,842.
The commissioner of this court who heard the testimony and took the evidence in this case has found that the unit cost to plaintiff of producing the 29,200 overcoats was $15.14463, exclusive of officers’ salaries and profit. In arriving at this figure the commissioner found that certain actions *723 by the Board with respect to plaintiff’s unit cost of production were erroneous and not supported by substantial evidence. We are in complete agreement with the commissioner’s findings as to unit cost and have adopted them as the court’s findings 22 through 28.
The commissioner also found that the evidence does not establish that the action of the Board in allowing 5 percent of plaintiff’s unit cost of production for officers’ salaries was arbitrary or capricious. By applying this percentage to $15.14463, plaintiff’s unit cost of production, the commissioner computed the unit cost of officers’ salaries to be $.75723. We are in accord with the commissioner’s finding as to officers’ salaries and adopt it as the court’s finding 29.
The Board allowed the plaintiff a profit of approximately 10% percent of production costs and officers’ salaries. In the light of the entire record we conclude that 10% percent of these items, as found by the court, is a fair and reasonable allowance for profit. Plaintiff’s production cost per unit amounted to $15.14463 and its officers’ salaries per unit amounted to $.75723, making a total of $15.90 per unit. By allowing plaintiff 10% percent of this figure we arrive at a miit profit of $1.67.
By adding plaintiff’s unit production cost, officers’ salaries per unit, and profit per unit we arrive at the final unit price of $17.57, which we find to be a fair and reasonable price. At this unit price the cost to the defendant of the 29,200 overcoats manufactured and delivered by the plaintiff would be $513,044.
The defendant has paid plaintiff $607,807.50, including $157,500 for the 7,500 overcoats manufactured by its subcontractor, and has filed a counterclaim in which it seeks to recover alleged overpayments to plaintiff.
Pursuant to the agreement between the parties permitting plaintiff to subcontract the manufacture of 7,500 of the overcoats, plaintiff is entitled to receive $117,375 for these coats instead of the $157,500 actually paid it.
Among the 29,200 overcoats manufactured and delivered by plaintiff were 29 coats rejected without any allowance to plaintiff. In addition, there were 5,650 overcoats having minor defects of varying degrees. In connection with these *724 defective coats, plaintiff agreed that the revised contract unit price would be reduced by amounts which ranged from 85 cents to $3.25 per overcoat. The total reductions amounted to $8,101.50.
At the unit price determined by the court, plaintiff is entitled to $513,044 for the 29,200 overcoats manufactured by it, plus $117,375 for the 7,500 overcoats manufactured by the W. & C. Clothing Company, or a total of $630,419, less $607,807.50, which plaintiff has been paid. Against the remainder of $22,611.50, defendant is entitled to a credit of $8,101.50 for the rejected and defective overcoats, leaving the sum of $14,510 as the net amount due plaintiff.
Judgment will be entered for plaintiff in the sum of $14,510.
It is so ordered.
Laramore, Judge; MaddeN, Judge; Whitaker, Judge; and LittletoN, Judge, concur.
FINDINGS OF FACT
The court, having considered the evidence, the report of Commissioner Wilson Cowen, and the briefs and argument of counsel, makes findings of fact as follows:
1. Plaintiff is a Massachusetts corporation and has its principal office in Boston. During 1946 and 1947 its main office and plant was located at 63 Beverly Street, and it also operated a liner plant at 64 Lincoln Street, both in Boston.
2. On June 14, 1946, the Quartermaster Purchasing Office at New York, hereinafter called the New York Office, issued invitations for bids for the manufacture of Army field overcoats with removable liners. The invitation, which was designated “Bequest for Informal Bid”, stated that the informal bids received would be used as a basis for negotiating contracts.
The bid form provided that the Government would furnish all cloth, liner materials, and cotton canvas padding and that the contractor would furnish other materials designated as trimmings and findings. Deliveries of the completed overcoats were to commence in February of 1947 and were to be completed by December 31, 1947.
*725 3. On June 19, 1946, the Kalis Clothing Manufacturing Company, a partnership, submitted to the New York Office its bid for the manufacture of 40,000 overcoats at a unit price of $22.75.
The bid was accepted and on June 29,1946, a written contract was entered into between the partnership and defendant, acting through Lt. Boyden Bearce as contracting officer, for the manufacture by the partnership of the number of coats and at the unit price stated in the bid.
4. Modification “C” to the contract, which was executed by the parties on November 27, 1946, reduced the contract unit price from $22.75 to $21.
5. The breakdown of unit costs contained in the original bid, as well as a revised breakdown which was used as the basis for Modification “C” to the contract, is set forth below:

6.Article 16 of the contract provided:
ARticle 16. Disputes. — Except as otherwise specifically provided in this contract, all disputes concerning questions of fact which may arise under this contract, and which are not disposed of by mutual agreement, shall be decided by the Contracting Officer, who shall mail to the Contractor a written notification of his determination. Within 30 days from said mailing the Contractor may appeal to the Secretary of War, whose decision shall be final and conclusive upon the parties. Pending decision of a dispute hereunder the Contractor shall diligently proceed with the performance of this contract.
*726 . The contract stated that certain supplementary contract provisions entitled “Eevision of Price” were incorporated in and made a part of the contract, except that the percentage mentioned therein was changed from 40 percent to 30 percent. The “Eevision of Price” article, so incorporated in the contract, read as follows:
14. Eevision of pkice :
(a) The prices fixed herein may be increased or decreased in accordance with this Article.
(b) Times for negotiation. — (1) Upon completion of delivery of forty percent (40%) of the items to be furnished under this contract, the parties shall negotiate to revise the prices of all items theretofore and thereafter to be delivered. Within 5 days after the completion of delivery of said forty percent (40%) the Contractor shall furnish to the Contracting Officer the statements and data referred to in paragraph (c) of this Article. At any time and from time to time after the completion of delivery of said forty percent (40%), subject to the limitations specified in this Article, either the Government or the Contractor may deliver to the other a written demand that the parties negotiate to adjust the prices under this contract. No demand shall be made prior to 90 days after the completion of delivery of said forty percent (40%) and thereafter neither party shall make a demand having an effective date within 90 days of the effective date of any prior demand, provided, however, that this limitation shall not be applicable in the event that during any 90-day period the War Labor Board or any similar Government agency shall authorize or order a change in wages, salaries or conditions of employment in the plants of the Contractor used in the performance of this contract. Each demand shall specify a date (identical with or subsequent to the date of the delivery of the demand) as of which the revised prices shall be effective as to the deliveries made thereon and thereafter. This date is hereinafter referred to as “the effective date of the price revision”. For the purposes of the first negotiation contemplated by this paragraph, the date of execution of this contract shall be deemed to be the effective date of the price revision. Any demand under this Article, if made by the Contractor, shall state briefly the ground or grounds therefor and shall be accompanied by the statements and data referred to in paragraph (c) of this Article. If the demand is made by the Government, such statements and *727 data will be furnished by the Contractor within 30 days of the delivery of the demand.
(2) In the event all remaining work under this contract, as it may from time to time be amended, shall be terminated under Article entitled “Termination at the Option of the Government” no demand shall then or thereafter be made and any demand the effective date of which is less than 30 days before the effective date of such termination shall be void and of no effect.
(c) Submission of data. — At the time or each of the times specified or provided for in paragraph (b) of this Article the Contractor shall submit (i) a new estimate and breakdown of the unit cost and the proposed prices of the items remaining under this contract after the effective date of the price revision, itemized so far as is practicable in the manner prescribed by War Department Standard Procurement Form No. 3; (ii) an explanation of the differences between the original (or last preceding) estimate and the new estimate; (iii) such relevant shop and engineering data, cost records, overhead absorption reports and accounting statements as may be of assistance in determining the accuracy and reliability of the new estimate; (iv) a statement of experienced costs of production hereunder to the extent that they are available at the time or times of the negotiation of the revision of prices hereunder; and (v) any other relevant data usually furnished in the case of negotiation of prices under a new contract. The Government may make such examination of the Contractor’s accounts, records and books as the Contracting Officer may require and may make such audit thereof as the Contracting Officer may deem necessary.
(d) "Negotiations. — (l)Upon the filing of the statements and data required by paragraph (c) of this Article, the Contractor and the Contracting Officer will negotiate promptly in good faith to agree upon prices for items to be delivered on and after the effective date of the price revision. Negotiations for price revisions under this Article shall be conducted on the same basis, employing the same types of data (including, without limitation, comparative prices, comparative costs, and trends thereof) as in the negotiation of prices under a new War Department contract.
(2) After each negotiation the agreement reached will be evidenced by a supplemental agreement stating the revised prices to be effective with respect to deliveries on and after the effective date of the price revision (or *728 such other later date as the parties may fix in such supplemental agreement).
(e) Disagreements. — If within 30 days after the date on which the statements and data are required pursuant to paragraph (b) of this Article to be filed (or such further period as may be fixed by written agreement) the Contracting Officer and the Contractor fail to agree to revised prices, the failure to agree shall be deemed to be a disagreement as to a question of fact which shall be disposed of in accordance with Article entitled “Disputes”, and the prices so fixed shall remain in effect for the balance of the contract notwithstanding any other provision of this Article.
(f) Payments. — Until new prices shall become effective in accordance with this Article, the prices in force at the effective date of the price revision shall be paid upon all deliveries, subject to appropriate later revision made pursuant to paragraph (d) or (e) or (h) (2) (B) of this Article.
(g) Termination provisions. — For any of the purposes of Article entitled “Termination at the Option of the Government” of this contract (including, without limitation, the computation of “the total contract price” and “the contract price of work not terminated”), the contract price of delivered articles shall be deemed to be,
(1) for all items delivered prior to the effective date of the price revision, the contract price (giving effect to any prior revisions under this Article) applicable to each such item;
(2) for all items delivered on or after the effective date of the price revision,
(A) the contract price as revised in accordance with this Article if such revision shall have been agreed upon; and
(B) if such revision shall not have been agreed upon, then such estimated prices as the Contractor and the Contracting Officer may agree upon as reasonable under all the circumstances and in the absence of such agreement such reasonable prices as may be determined in accordance with Article entitled “Disputes”.
(h) Termination during the initial period. — In the event that this contract is terminated under Article entitled “Termination at the Option of the Government” or the Contractor’s right to deliver is terminated under Article entitled “Delays-Damages”, so that the last delivery under the contract as terminated is made prior to *729 the completion of the initial period as specified in paragraph (b) of this Article, the Contractor within 15 days after such last delivery shall furnish the data required by paragraph (c) of this Article and thereupon the parties shall negotiate in good faith to agree upon revised prices under this contract. The agreement reached shall be evidenced by a supplemental agreement to this contract stating the revised prices under the contract. Any disagreement as to the revised prices will be disposed of as a question of fact in accordance with Article entitled “Disputes”.
7. The plaintiff corporation was organized about December 31,1946, and by a bill of sale of that date it acquired all of the right, title, and interest in the assets of the partnership, including an assignment of the overcoat contract as amended, and the corporation assumed responsibility for the performance of the contract.
By a tripartite agreement entered into on March 13,1947, between the partnership, the plaintiff, and the United States, represented by Maj. Lewis Yoiers as successor contracting officer, the assignment of the overcoat contract to plaintiff was agreed upon, and the assignment was approved by the Government.
8. On March 17,1947, plaintiff entered into a subcontract with the W. & C. Clothing Company, which agreed to manufacture 7,500 of the overcoats required in plaintiff’s contract at a unit price of $16.06. The W. & C. Clothing Company was one of 18 contractors engaged in the production of the same overcoat for the Government under an identical form of contract as that entered into with plaintiff.
On March 17,1947, plaintiff wrote Maj. Lewis Voiers, who by that time had succeeded Lieutenant Bearce as contracting officer, as follows:
*****
We request permission to sub-contract 7500 Overcoats, Field O. D. #7 w/r liner as we are late on delivery.
In consideration of our receiving permission to subcontract to W & C Clothing Co. 22 West 21st St., N. Y. C., 7500 Overcoats, Field, OD 7 with Bemovable Liner, covered by contract QMPQP-161C we hereby agree to the tentative price under said contract from $21.00 to $16.06 insofar as such price applies to the above 7500 Overcoats. We further agree that any upward or *730 downward revision of the aforementioned price of $10.06 shall be based solely upon costs and profits of the subcontractor W & C Clothing Co.
We realize that we are in no way relieved of any responsibilities by sub-contracting. Also that any additional costs will be assumed by us.
$ ‡ ‡
On the same day, the W. & C. Clothing Company wrote the New York Office in part as follows:
This is to advise you that we have this day entered into an agreement with the Kalis Clothing Manufacturing Co., 63 Beverly St. Boston 14, Mass., to manufacture for them 7500 Overcoats, Field, O. D. 7 with Kemovable Liner.
We hereby agree to manufacture and deliver to the Government 7500 Overcoats, Field, OB, with Kemovable Liner in the amount of $120,450.00 under contract QM POP161C at a tentative price of $16.06 each which price shall be subject to revision upward or downward in the manner and to the same extent as Overcoats being manufactured by us for account of the Government under Contract QM 2758.
The subcontractor delivered the 7,500 overcoats for the account of plaintiff during April, June, and July 1947, and was paid by plaintiff at a unit price of $16.06, or a total of $120,450. During the same period, plaintiff invoiced these overcoats to the Government at a unit price of $21 and received therefor payments aggregating $157,500.
9. On June 6, 1947, the New York Office wrote plaintiff, stating that 30 percent of the total quantity of coats had been delivered and requesting that plaintiff submit cost data in accordance with the provisions of the price revision article of the contract.
Plaintiff responded to the request by submitting cost data on June 13, 1947. On June 20, 1947, plaintiff sent the defendant a revised statement of costs in which plaintiff’s total proposed unit price was $21.
10. By letters dated July 17, August 18, and September 18, 1947, the contracting officer requested plaintiff to agree to extend the time specified in the contract for negotiating a revision of price. The requests were based on the statement that sufficient data were not available to enable the parties to *731 reach an agreement within the time provided for in the contract. Plaintiff assented to each of the requests, and during the period thus extended for renegotiating the contract price, the contracting officer sent plaintiff eight separate requests for additional cost information. Plaintiff responded promptly by submitting additional information from time to time up to October 6,1947.
11. The evidence does not show what negotiations were carried on by the parties in an effort to reach an agreement on a revised price, but on October 16, 1947, Major Yoiers, the contracting officer, made his determination of a revised price. The determination, which was mailed to plaintiff, read in pertinent part as follows:
In view of the fact that the contracting officer and the contractor have failed to agree to revised prices, the contracting officer, acting in accordance with paragraph (e) of the “Revision of Price” article and the “Disputes” article of subject contract, finds the sum of $15.00 to be the fair and reasonable price of the 40,000 Overcoats, Field, OD 7, with Removable Liner applicable to subject contract, and fixes the price at said $15.00 on all overcoats, effective 29 June 1946 the date of execution of Contract W30-280-qm-2751.
As a result of the determination made by the contracting officer, the defendant requested plaintiff to refund the sum of $15,000 out of the payments that previously had been made to it.
12. On October 20,1947, plaintiff wrote the contracting officer, acknowledging receipt of his decision and of the request for refund. In its letter, plaintiff requested a payment of $57,540 for coats previously delivered at the unit price of $21 and also stated:
‡ ‡
We are now ahead of our delivery schedule, and your unreasonable and arbitrary decision has created a situation where deliveries will necessarily stop as we have no funds to continue the manufacture of these goats. Please note that unless either a payment is forthcoming this week or a letter is received stating that such a payment will be made not later than next week, we will close down this Friday.
*732 Colonel Grice, the commanding officer of the New York Office, wrote plaintiff on October 22,1947, that its letter would be considered as an appeal to the Board of Contract Appeals, but on November 3,1947, plaintiff filed its formal appeal with the Secretary of War. The appeal read in part as follows:
As a result of my talk with Colonel Grice in New York on October 27th, at his request I agreed to cancel the contract insofar as it covered the balance of coats which were not cut, about 3,300. I agreed that I would complete all the work in process because if I had not done so it would have meant turning back to him a great number of cut pieces which he would have had great difficulty having completed.
13. On November 24, 1947, the contracting officer notified plaintiff that because of its statement that it would not cut or deliver the remaining 3,300 overcoats required to be delivered by December 31, 1947, the contract had been terminated with respect to the 3,300 coats in accordance with Article 17, the “Default” article of the contract.
14. Under date of November 13, 1947, Major Voiers, the contracting officer, issued an amended determination, which read in pertinent part as follows:
After renegotiation by and between the contracting officer and the contractor and reconsideration of all evidence submitted in this matter, it is the determination of the successor contracting officer that the Finding of Fact and Determination of 16 October 1947 be and is hereby amended and the fair and reasonable price of 40,000 Overcoats, Field, OD 7, w/Bemovable Liner applicable to subject contract is hereby fixed at a unit price of $15.65 arrived at as follows:
Fair and reasonable costs of production (after consideration of all factors called for in revision of price article) _$13.16
Executives’ salaries_ . 39
Profit_ 2.10
Revised price- 15.66
The said amended revised price of $15.65 is effective as to all deliveries made on and after 29 June 1946, the date of execution of Contract W30-280-qm-2751.
The profit of $2.10 per unit allowed by the contracting officer’s amended determination is in the same amount as was *733 stated in plaintiff’s revised breakdown of costs, which was used as the basis for Modification “C” to the contract (finding 5).
15= Plaintiff’s appeal was heard by the Army Board of Contract Appeals on April 21, 1948. Thereafter on June 14, 1948, the Board issued a decision, modifying the contracting officer’s revised price and fixing the sum of $15,842 as the unit price for the 29,200 overcoats manufactured by plaintiff. This unit price included $13,659 as the cost of production, $.683 for officers’ salaries, and $1.50 for profit.
At plaintiff’s request, the Board granted a rehearing, which was held on September 16, 1948, and thereafter on October 4, 1948, the Board issued a supplemental opinion by which it reaffirmed its former decision.
Both decisions of the Board were adopted by the Secretary of the Army.
16. In paragraph 19 (a) of its amended petition, plaintiff alleged that the decision of the contracting officer was fraudulent in that he induced plaintiff to execute Modification “C” to the contract and to reduce the contract unit price from $22.75 to $21, by orally representing to plaintiff that no further renegotiations would be required and that the price of $21 would be the final price for the entire contract. The evidence is insufficient to establish fraud on the part of the contracting officer, and it appears[1] that plaintiff is no longer relying on its plea of fraud. However, plaintiff claims that the decision of the Army Board of Contract Appeals, which was adopted by the Secretary of the Army, was arbitrary, capricious, and so grossly erroneous as necessarily to imply bad faith, and that it was not based on substantial evidence.
17. At the hearing before the Board, the plaintiff submitted a statement of its operating costs for the calendar year 1947, as the cost of its performance of the overcoat contract. The Government offered in evidence an audit of plaintiff’s records for the entire period of performance from December 1, 1946 to December 31, 1947. This audit, which was made by a representative of the Army Audit Agency, is *734 in evidence as defendant’s exhibit 4, and the auditor’s detailed work papers from -which the audit was prepared are in evidence as defendant’s exhibit 5.
Excluding $121,450 paid to subcontractors, plaintiff’s statement showed that its operating costs for 1947 amounted to $525,315.86. This did not include profit of $61,320 allowed by the contracting officer. Plaintiff commenced work on the contract about December 1, 1946, but in the statement submitted to the Board plaintiff did not claim any costs for that year.
18. In connection with its appeal of November 3, 1947, to the Secretary of War, plaintiff submitted a statement of its operating costs to September 30, 1947. The statement showed that its sales invoices to the Government on contract deliveries in 1947 amounted to $607,807.50 and that civilian sales to others in that year amounted to $47,071, or to about seven percent of total sales. Despite this fact, plaintiff’s president testified before the Board that plaintiff manufactured no civilian clothing during 1947. However, plaintiff’s attorney frankly told the members of the Board that plaintiff had engaged in some civilian business, both in 1946 and 1947, and the evidence before the Board clearly established the fact that plaintiff had manufactured and sold civilian clothing during the period the contract was performed.
19. When the Army Audit Agency accountant examined plaintiff’s books, he learned that plaintiff had manufactured and sold civilian clothing during the period the contract was performed but that plaintiff had not maintained a system of cost records for allocating the cost of making the Army overcoats separately from the costs attributable to the manufacture and sale of civilian clothing. Plaintiff’s total labor costs were summarized on its books in one account, but it maintained a good system of production control on piecework operations. Each lot of cloth used carried a list of piecework operations. The list was perforated for each class of work, and after each employee finished his work, he would tear off and sign the worksheet covering the classification of work done by him. These slips were summarized weekly and turned in to the bookkeeper. The piecework entries were designated as “Army” or “Civilian”, and from *735 these basic records the Government accountant determined the cost of piecework labor on contract work and on civilian work. He found that $14,051.36, or 88.63 percent of the piecework wages paid in December 1946, and $17,002.19, or 8.15 percent of the piecework wages paid during the calendar year 1947, were applicable to civilian business. The total of $31,053.55 represented 13.83 percent of the cost of piecework labor during the entire period of performance.
Piecework was performed only in the sewing department, but wages paid to pieceworkers represented approximately 65 percent of the entire factory payroll. Employees performing cutting work were paid on a time basis and their wages amounted to about 6 percent of the factory payroll. Foremen, whose wages constituted about 6 percent of the factory labor, and other hourly paid employees, whose wages represented about 23 percent of the factory payroll, were included in sewing labor.
Having determined the percentage of the cost of piecework labor applicable to Army work and that applicable to civilian work, the accountant allocated all other factory labor in the same proportion.
In view of plaintiff’s lack of separate cost records, the method used by the defendant’s accountant was based on sound accounting principles. His audit and his detailed work papers constitute the most reliable evidence of the costs incurred by plaintiff in the performance of the contract.
20. Throughout the period of performance, plaintiff paid a high-cost-of-living wage rate of 12*4 cents an hour, and its labor account also included amounts expended for holiday pay, overtime premium pay, and vacation pay. The defendant’s auditor reclassified all of these expenses as indirect labor. In addition, he reduced the amount of $17,-242.43, claimed as vacation pay by plaintiff, by the sum of $6,980.20, and made no allowance for overtime premium pay for December 1946 and for 1947. He also deleted $9,500 which plaintiff had accrued for the payment of State income and excise taxes for 1947, because at the time of the audit, he could not determine the amount of profit which plaintiff would realize from the contract.
*736 After making several other adjustments and disallow-ances for items he considered not properly chargeable to the Government contract, the auditor reported that plaintiff’s unit cost for manufacturing the 29,200 overcoats was $14.87544. The total contract costs, as determined by the auditor, did not include the $120,450 which plaintiff had paid to its subcontractor, the W. & C. Clothing Company, for manufacturing the 7,500 overcoats, nor did they include officers’ salaries or profit. The last two items were left to the decision of the contracting officer.
21. The accountant who prepared the Army Audit Agency audit testified during the hearings before the Army Board of Contract Appeals and had his work papers with him at that time. His audit was received in evidence and his work papers were made available to the Board, but the record does not disclose whether the Board admitted the work papers in evidence. When questioned at the hearings about the extent of plaintiff’s civilian business in 1946 and 1947, the defendant’s accountant stated that an estimated 30 percent of the $31,053.55, which he had determined as the cost of piecework labor during the entire period of contract performance, was expended by plaintiff in the month of December 1946. However, the accountant failed to testify that 88.63 percent of the piecework wages paid in December 1946 was for civilian work, but that only 8.15 percent of such wages paid during the entire year 1947 was for civilian work.
Other evidence heard by the Board with respect to plaintiff’s civilian business showed that plaintiff’s invoices for the sale of 4,565 civilian garments in 1947 amounted to about $59,000, whereas its invoices for the Army overcoats, including 29,200 made by plaintiff and 7,500 made by its sub-tractor, amounted to more than $762,000.
22. The Army Board of Contract Appeals did not adopt the accounting method used by the Army Audit Agency, nor did it accept the costs as determined in that audit. Instead, the Board first applied the deletions and adjustments made by the Army Audit Agency to most of plaintiff’s basic accounts for 1947 and then arrived at the contract costs by deducting a flat 14 percent of plaintiff’s remaining costs for 1947. In view of the accountant’s testimony that the figure *737 of 13.83 percent determined by him was the percentage of the labor costs applicable to civilian work done in December 1946, as well as during 1947, and that a considerable part of the expenses for piecework labor on civilian work was incurred in December 1946, the Board’s action was erroneous, resulted in excessive allocations of costs to civilian work, and substantially reduced the costs of performing the overcoat contract as determined by the Board. The Board’s decision in that respect is not supported by substantial evidence.
23. The Board deleted from plaintiff’s costs the amount claimed for vacation pay to employees. This item consisted of $5,970.75 paid by plaintiff in July 1947 and $11,271.58 accrued for 1947 and payable in July 1948. In view of plaintiff’s agreements with the Amalgamated Clothing Workers of America, the accrued vacation pay was a true liability and was properly accrued on plaintiff’s books. The employees were required to continue in plaintiff’s employment in order to obtain the vacation pay, but temporary layoffs did not render them ineligible.
Prior to May 1947, the agreement with the union provided for paid vacations of two weeks for each employee with one year’s service or more, and for reduced vacation pay of not less than one week for employees having a lesser period of service. By the agreement of May 1,1947, vacation pay of one week was allowed for each employee with one year’s employment, and proportionate pay was provided for workmen with nine or more months of service, as well as for those with six months’ or more service. Under a supplemental agreement entered into in November 1947 and made retroactive to January 1947, additional longevity vacation pay was provided for employees having two or more years’ service.
In analyzing the vacation pay account, the defendant’s auditor determined that $2,627.13 of the vacation payments of $5,970.75 made in July 1947 were allocable to 1946 services. By assuming that the same proportion of the 1947 accruals would be paid in 1948, and computing the longevity pay separately, the auditor determined that $6,980.20 of the 1947 accruals would become payable in July 1948. Thus, he excluded $4,291.38 of the accruals and found that the vaca *738 tion allowances paid and to become payable by plaintiff for 1947 amounted to $10,328.82. Since a proportion of tbe employees would become disqualified to receive vacation pay because of resignations or failure to return after temporary layoffs, tbe amount of vacation pay as computed by defendant’s auditor was fair and reasonable.
Tbe Board’s action in failing to allow any amount for vacation pay was erroneous and is not supported by any evidence in tbe record.
24. As stated in finding 20 above, tbe Army Audit Agency made no allowance for overtime premium pay, which amounted to $3,831.66 during tbe period of performance. However, this expense was not deleted by the Board, and tbe amount thereof that is allocable to the contract work is $3,415.34, or $.11696 per unit.
25. Tbe Army Audit Agency audit did not include any allowance for State income and excise taxes, which were charged to general administrative expenses on plaintiff’s books, because defendant’s accountant was not able to determine the amount of profit that would be realized from the contract. In its decision, the Board allowed a reserve of $6,000 for the payment of these taxes, and plaintiff agreed to accept that allowance. The portion thereof allocable to the contract is $5,511.04, or $.18873 per unit.
26. As part of its general administrative expenses, plaintiff claimed the sum of $1,937.67 for traveling expenses. On the basis of the evidence before it, the Board reduced this item to $1,000, and plaintiff has not excepted to this determination.
27. In determining the revised unit price for the contract, both the Army Audit Agency and the Army Board of Contract Appeals excluded the $120,450 that plaintiff paid to its subcontractor, the W. & C. Clothing Company, for the 7,500 coats manufactured by that subcontractor. In view of the facts set forth in finding 8, the amount paid to the W. & C. Clothing Company was properly excluded in arriving at the costs incurred by plaintiff in manufacturing the 29,200 coats delivered by it.
28. Excluding officers’ salaries and profits, the costs in *739 curred by plaintiff in manufacturing the 29,200 coats under its contract are set forth in the following table, which also shows unit costs as determined by the Army Audit Agency:

29. As part of its contract costs, plaintiff has included officers’ salaries of $21,000 for Louis Kalis, President, and $15,625 for Aaron Kalis, Clerk of the Corporation. Although salaries amounting to $36,625 were charged on plaintiff’s books in 1947 for the two officers, the salaries actually paid to them were $700 per week in January and February 1947 and $325 per week thereafter. Salaries of $8,600 for Louis Kalis and $7,525 for Aaron Kalis were accrued and unpaid at the end of the year.
Aaron Kalis was plant superintendent and, as such, was in complete charge of manufacturing and supervising production in all departments. He also devoted some time to general administrative duties. At the time the contract was performed, he had been engaged in the clothing business for 16 years, and the evidence establishes that an annual salary of $15,625 was not unreasonable for the services of a plant superintendent of his ability and experience. However, no apportionment of his salary to factory supervision was made on plaintiff’s books or in the audit of the Army Audit Agency.
Louis Kalis had been in the clothing manufacturing business for more than 40 years at the time the contract was executed. His time was primarily devoted to general administration and supervision of the business.
*740 The Army Board of Contract Appeals allowed five percent of other production expenses for officers’ salaries on the basis of a comparison with salaries paid by other contractors. It has not been established by the evidence that the Board’s decision with respect to officers’ salaries was arbitrary or capricious. At five percent of other production costs, the unit cost of officers’ salaries amounts to $.75723.
30. The Board of Contract Appeals fixed plaintiff’s profit at $1.50 per unit which is approximately 10y2 percent of the unit cost of production and the officers’ salaries per unit, both as allowed by the Board.
From all of the evidence it is found that 10y2 percent of plaintiff’s unit cost of production and officers’ salaries per unit, both as found by the court, is a fair and reasonable profit under the circumstances. Plaintiff’s unit cost of production is $15.14463 and its officers’ salaries per unit is $.75723, making a total of $15.90 per unit. Allowing plaintiff 10y2 percent of this figure, it is found that plaintiff’s unit profit is $1.67.
With the addition of a profit of $1.67 per coat, the revised unit price amounts to $17.57, and the total revised price for the 29,200 overcoats is the sum of $513,044.
31. The Government has paid plaintiff $607,807.50, including $157,500 for the 7,500 overcoats manufactured by its subcontractor, the W. & C. Clothing Company.
In its counterclaim filed herein, defendant seeks to recover from plaintiff alleged overpayments. Defendant takes the position that plaintiff is entitled to receive the unit price determined by the Board of Contract Appeals for the 29,200 overcoats manufactured and delivered by it, and $15.65 per overcoat, the revised unit price fixed by the contracting officer for the W. & C. Clothing Company, for the 7,500 overcoats manufactured by the W. & C. Clothing Company. Defendant also claims that it is entitled to a credit for defective overcoats.
In consideration of the Government’s permitting it to subcontract the manufacture of 7,500 overcoats, plaintiff agreed that any upward or downward revision of the subcontract unit price of $16.06 would be based “solely upon costs and *741 profits of the subcontractor, W. & C. Clothing Co.” The contracting officer determined that the revised unit price to the W. & C. Clothing Company should be $15.65 for its entire production, including the 7,500 coats manufactured for plaintiff. No appeal was taken from that decision.
After the Army Board of Contract Appeals rendered its decision, the contracting officer prepared Modification “G”, which provided for a revised unit price of $15,842 (as determined by the Army Board of Contract Appeals) for the 29,200 coats manufactured by plaintiff and a revised unit price of $15.65 (as determined by the contracting officer) for the 7,500 coats manufactured by the W. & C. Clothing Company, but plaintiff declined to execute this modification.
Among the 29,200 overcoats manufactured and delivered by plaintiff, there were 29 coats rejected without any allowance to plaintiff. In addition, there were 5,650 overcoats having minor defects of varying degrees. In order to obtain acceptance of and payment for these coats, plaintiff agreed that the revised contract unit price would be reduced by amounts which ranged from 85 cents to $3.25 per coat. The total reductions from the revised contract price amounted to $8,101.50.
32. At the revised unit price herein determined, plaintiff is entitled to $513,044 for the 29,200 overcoats manufactured by it, plus $117,375 for the 7,500 overcoats manufactured by the W. & C. Clothing Company, or to a total of $630,419, less $607,807.50, which plaintiff has been paid. Against the remainder of $22,611.50, defendant is entitled to a credit of $8,101.50 for the rejected and defective overcoats, leaving the sum of $14,510 as the net amount due plaintiff.
CONCLUSION OF LAW
Upon the foregoing findings of fact, which are made a part of the judgment herein, the court concludes as a matter of law that the plaintiff is entitled to recover, and it is therefore adjudged and ordered that it recover of and from the United States fourteen thousand five hundred and ten dollars ($14,510).

 Plaintiff has not requested any findings of fact in support of its allegations of fraud.